IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA

   v.                Case No.: 20-cr-00010-jdp

DAVID M. KRUCHTEN,

    Defendant.

GOVERNMENT'S SENTENCING MEMORANDUM

For years, the defendant abused the trust of his students, their parents, and the school system and secretly recorded many of his female students in the bathroom. The exact number of victims cannot be known because prior to his arrest, the defendant destroyed all of the evidence of his illegal activities. While it might be tempting to consider this case to be less serious than other child exploitation cases this Court has seen, the government believes that it is at least as serious and, in some ways more. The victims were not unknown children the defendant met online, as we often see in these types of cases. Rather, the defendant was a trusted advisor to each of these students. He was respected by their parents and the school system. And while there is no evidence he touched any student, his actions left the victims questioning their future and doubting their self-worth. Prior to being discovered by one of those victims, there was no indication that the defendant had any intention of stopping. He deserves a sentence that reflects the full impact of his actions. The government believes that sentence is fifteen years in custody. As the Court is aware, fifteen years is the

mandatory minimum for producing and attempting to produce child pornography, which is exactly what the defendant did.

## RESPONSE TO DEFENDANT'S OBJECTION TO THE REVISED PSR

The defendant objects to an enhancement for obstruction of justice. (R. 74, pg. 2). For the reasons that follow, the government urges the Court to overrule the defendant's objection and adopt the guidelines as calculated in the amended PSR.

Pursuant to USSG § 3C1.1, two levels are added to the offense level if a defendant willfully impedes an investigation, and the conduct relates to the offense of conviction. Examples of this include destroying or concealing evidence that is material to an official investigation and providing materially false information to a law enforcement officer that significantly impeded the investigation of the instant offense. § 3C1.1, n. 4(D) and (G).

Here, the defendant impeded the investigation in at least three different ways. First, he removed the sim cards from the two devices he actually turned in to the hotel desk. Second, he disposed of the remaining devices recovered from the hotel rooms (Exhibit 1) and told law enforcement officers he gave them to a security guard at the hotel. Third, he told the students he called the police and that they were on their way, keeping the students or their families from calling the police. This delayed response kept the police from getting there in time to complete a full investigation before the students left Minneapolis, and likely kept the devices the defendant disposed of from being located in trash cans outside the hotel.

Additionally, while the government is not asking the Court to impose the enhancement on these grounds, the Government believes the defendant's explanation of the offense both to the Court at his plea hearing and to the PSR writer borders on obstruction. USSG § 3C1.1, n. 4(F) and (H). As discussed in detail below, the idea that he was simply "curious" misrepresents his conduct. Moreover, there is no evidence that there were ever recording devices placed in the rooms of boys or in areas other than bathrooms.

## SENTENCING FACTS

A.   Minneapolis

On December 6, 2019, a group of East High School students in the Distributive Education Clubs of America (DECA) traveled to Minneapolis for a conference. The defendant was their teacher advisor/chaperone. On December 7, 2019, at approximately 11:15 p.m., a female student identified as Minor Q in the superseding indictment discovered that an air freshener in the bathroom of her hotel room was actually a hidden camera. She was staying in room 809.

Upon making this discovery, she went to another room and notified the occupants, all boys. The boys searched their room and while they found a single air freshener, interviews with the boys clearly show there was no camera in it.[1] (See Exhibit 2, a compilation of statements from students who were present in the boys'

---

[1] The last sentence in paragraph 18 of the PSR is incorrect in that it says the air freshener in the boys' room also had a camera. The government apologizes for not catching that error earlier and bringing it to the PSR writer's attention through objections.

3

room that night) (Minor Q found out the boys had an air freshener too, "but mine had a camera in it"); (the air freshener in the boys' room was similar to the camera first found "without like, the large battery pack that would have been, the camera seemed to be duct taped and wires that would connect, but we didn't have the physical camera"); (both girls' bathrooms had alarm clock cameras in the bathroom, but the boys' room did not); (there was no camera device or lens in the air freshener found in the boys' room).

Some students took these two devices to defendant while other students looked for additional devices. While the reports are a little unclear, it appears that in one girls' bathroom - 805, there was an air freshener, an alarm clock, a smoke detector, and a box of tissues. In the other girls' bathroom – 809, there was the original air freshener, a smoke detector, a thermostat, an alarm clock, and a tissue box. Because the defendant came in and removed devices before the students knew what they were, the exact number is difficult to determine. Some of the items, however, can be seen in selfies taken by the students prior to the discovery that they were surveillance devices. (Exhibit 3). Between the pictures and the interviews at the scene, it seems clear that multiple devices were found in the girls' bathrooms and one non-working device was found in the boys' bathroom.

After the devices had been found and the students were understandably panicked and distraught, the defendant told them he called the police, when he had not. Moreover, he lied to the students about the possible source of the devices, sending a text message to one student, telling her that guests sometimes have them to "make sure

4

maids don't steal their stuff." (Exhibit 4). He even lied to the student saying he found recording devices in his room. (Id.).

B. Wisconsin Dells 2019 and 2018

DECA held conferences at the Kalahari Resort in October 2018 and October 2019. On each of these trips, the defendant called the resort directly and used his own personal credit card to upgrade a group of female students that he selected to the Congo Suite, a two-bedroom, two-bathroom suite. In 2018, the students he assigned to this suite included one 14-year-old, one 15-year-old, four 16-year-olds, and one 17-year-old. In 2019, the students included two 14-year-olds, one 16-year-old and three 17-year-olds.

Students provided pictures from 2019 that show an air freshener, a digital clock, a thermostat, and a tissue box recording devices in the bathroom off the king bedroom. (Exhibit 5). They also show devices disguised as a thermostat, a digital clock, and an air freshener in the bathroom off the queen bedroom. (Exhibit 6).[2]

Similarly, students provided images from 2018 that show an air freshener on the toilet and another air freshener, a tissue box, and an alarm clock on the counter of the bathroom off the king bedroom. (Exhibit 7). They show a thermostat and an air freshener in the bathroom off the queen bedroom. (Exhibit 8). Representatives from the resort confirmed that none of these devices were placed in the rooms by the resort.

---

[2] These images are slightly blurry as they are still shots taken from a video of the bathroom.

Images captured from the resort's video surveillance in 2019 show the defendant sneaking in and out of an additional student room – not the Congo Suite. While entering the room, he had a drawstring bag on his back. (R. 87, ¶ 55). The next morning, he can be seen carrying a rectangular object concealed under a towel. (Id., ¶ 57). (See also Exhibit 9). While the students assigned to that room did not have any photographs to show the police, one distinctly recalls an alarm clock being in the bathroom because she had never seen that before.

In one of these trips to the Dells, the defendant enticed a student, identified in the indictment as Minor N, to attend just to have her stay in one of the upgraded suites he arranged. He told her she did not even have to take part in the conference events. (R. 76).

  C.  Other locations and victims

The hidden recording devices can also be seen in hotel rooms from trips to other districts. In Lake Geneva for example, a tissue box and an alarm clock can be seen on the bathroom counter. (Exhibit 10). An air freshener can be seen in what appears to be the same location. (Exhibit 11).

And, in addition to his students, the defendant also recorded a minor who was babysitting his child, identified in the original indictment as Minor G. In January 2019, the defendant asked her to come to the Wilderness in the Dells and watch his kids. When she got there, the defendant gave Minor G a key to her room. In a video she turned over to law enforcement, 4 separate recording devices - two air fresheners, a digital clock, and a tissue box - can be seen in that bathroom. (Exhibit 12).

As one parent described it best, "As part of the trips he supervised, he arranged who slept in what rooms, he entered rooms and placed cameras carefully to capture victims at their most vulnerable, he had a process to distribute keys and to do room sweeps after. His crimes were not spur of the moment or crimes of opportunity. They were premeditated. And they were numerous. And they would have continued had not a few brave students found and reported the devices."

## THE VICTIMS

Based on the nature of the defendant's crime, and his destruction of evidence, the total number of victims cannot be known. What is known is that while teaching, coaching, and advising at Madison East, the defendant traveled the country with more than 100 students, most between the ages of 14-17, many of whom were violated and exploited by the defendant. The victims include current students, as well as young women who have already graduated. The current students should have been readying for graduation, enjoying prom, participating in school activities, and planning the next stage of their life. The former students should have been experiencing their new life as a high-school graduate, whatever that entailed. Instead, each has been forced to find her own way to cope with the knowledge of how the defendant violated them. For some, it will be speaking at sentencing. For others, it may be an exercise in compartmentalizing and suppressing painful memories. No matter how each victim decides to cope with what happened, each of them will have a life affected by the defendant.

Before the defendant's actions were exposed, he was a student-favorite. He went out of his way to endear himself to his female students. "The girls revered him as a

7

mentor and spoke of him with animated affection and delight." Some spent hours in his classroom, working on projects and other extracurriculars that he ran. Others spent hours in his classroom doing "nothing essentially" in a class he created just for them. He coached tennis and recruited his tennis players to participate in DECA, saying how fun the trips were. He was "a teacher, a coach, and a mentor. He was celebrated in school press and was friends with the principal."

Most of the victims reported that they felt safe with him, that he encouraged them to participate in DECA and cheered them on when they did well. One student reported that all she wanted to do after he encouraged her to travel for DECA was "prove to him that I was good enough to travel with the club and to be his favorite." A parent reported their children "were mentored by him, they received texts, special attention, and were recruited to go on trips." "Mr. Kruchten was the teacher I trusted the most. I would turn to him for advice on everything from relationships to investing."

The Court has already seen some written victim impact statements and will also hear from some of those and other victims at the sentencing hearing. Feelings expressed by the victims include betrayal, sadness, and anger. "I was vulnerable and he recognized that." "I loved him, but now I'm mourning the person that I thought he was while I'm forced to reevaluate every aspect of my relationship with him. I feel so used. I feel unsafe. I feel like I lost my optimism about the world." "I am here today because David Kruchten decided to manipulate, groom, and take advantage of me and countless other students." "My new default is fear."

For some he took away their great memories of a high school experience and their sense of identity. "My happiest memories from my adolescence were spent in hotels around the country during DECA events.  I don't have any happy memories anymore." "The things he did, and the experiences I had are so intertwined now.  I can't separate the good." "We cannot look at any [of our child's accomplishments] with joy or pride untinged with sadness and loss because he was closely associated with each."

For others, his actions have impacted how they learn and have made them nervous around other men.  One reported hyperventilating when in close proximity to male teachers.  "The thought of creating bonds with men, especially men who are older than me or are in a position of power over me makes me extremely anxious." "She has had to ask for accommodations for online learning not to enable certain camera software." "Mr. Kruchten has taken away my sense of innocence, my trust in adults and has left me a little cynical to certain people."  One now-college student reported being afraid to go on an overnight field trip because it was a school-affiliated trip with a male professor she trusted.  One student even expressed hesitancy to interact with an uncle.

Other students explained their new normal, sweeping unfamiliar rooms for recording devices, and nightmares.  "My body almost always feels dirty." "I examine every public bathroom before I use it, to the point where I lift up air fresheners mounted on walls just to double check." "I struggle with completing basic daily tasks such as showering or getting dressed without feeling as though I am being watched."

In addition to affecting the victims, the defendant's crimes also impacted the victims' families.  One mother described the heartbreak of watching her daughters

9

vacillate between feelings of anger, betrayal, and deep sadness.  Another reported second guessing her willingness to allow her daughter to go on DECA trips.  And another mother said, "I lost trust in myself."  "I encouraged my children to participate in DECA and work with Kruchten, and now I feel that I did not do the one thing that means the most to me – be a good mom that protects her kids.  I hate myself for that."  One parent said, "He was someone that for years our daughter trusted and looked up to and we in turn trusted him to ensure the safety and well-being of our child."  Of course, we now know that trust was entirely misplaced.

The defendant's actions also destroyed relationships and long-standing friendships.  One parent reported ending her personal relationship with her partner.  Another parent whose daughter was not a victim described "survivor's guilt" and explained, "the trauma caused by David Kruchten's actions acted as a brutal accelerant in the breakdown of [years-long childhood friendships] during their senior year.  A hard and fast rift in East's social structure appeared between those who had been violated and those who could only stand by, uncertain how to navigate a world where the unthinkable had happened."  "Kruchten's actions damaged not only our daughter's relationships with her two closest friends but also what had once been the thriving friendship" shared between parents.

## ARGUMENT

In sentencing the defendant, Title 18, United States Code, Section 3553(a) directs this Court to focus on who the defendant is and what the defendant did (Section 3553(a)(1)), and to address various societal goals in sentencing (Section 3553 (a) (2-7)).

Notably, these factors do not involve merely a focus upon the defendant's background and the impact of the sentence on the defendant. Rather, a correct application of these factors to any case involves a balancing of all the factors, which also include the guidelines, the defendant's criminal conduct, and its impact upon the victims.

No question, the guideline range in this case – 292 to 365 months – represents a severe range of punishment. And the government does not recommend such a sentence. Rather, the government believes a sentence of fifteen years is sufficient but not greater than necessary to meet the goals of sentencing.[3]

    A.    Nature and Circumstance of the Offense and History and Characteristics of the Defendant

        1.    The offense

Because the defendant destroyed the evidence in this case, we cannot know the full extent of his offense. We do not know the nature of the recordings he made. Did they simply show the victims changing clothes, getting in and out of the shower, and using the toilet, which is bad on its own, or did he zoom in on each victim's vagina, and make screen shots? Did he sort and categorize the images by body part or student name? Did he save them on multiple devices to always have access to them? He claims he would watch them and then reuse the memory card, but because he destroyed the evidence, there is no way to verify that.

---

[3] Even if the Court declines to adopt the guideline calculation laid out in the Amended PSR, the government believes a sentence of 15 years is the appropriate sentence considering all the § 3553 factors.

11

Despite all the unknowns, we do know that the length of time this occurred, the efforts to which the defendant went to record his victims, the risks he took to engage in his behavior, and the sheer volume of victims is stunning. The impact on all of the students, their families, the school as a whole, and the shock waves to the community is hard to overstate. The defendant – in what our society often reveres as one of the most important roles in a child's life – committed one of the most serious violations of trust imaginable.

Over the course of years, he repeatedly took secret video recordings of the victims at their most vulnerable and intimate moments – undressing, showering, and using the bathroom. This was not a one-time failure of judgment. It was a deliberate, calculated, and repeated course of conduct.

2.   The defendant

One of the best ways to assess the defendant's true character is through his psychological evaluation which shows him to be untruthful, calculating, and manipulative.[4] In addition, throughout the report, he continues to minimize his behavior, claiming he was merely "curious," attempting to portray himself as an equal-opportunity voyeur as opposed to a sex offender interested in underage females.

---

[4] Because the defendant's risk assessment was based primarily on self-reporting which is demonstrably false, it should be given little credence. Additionally, as part of her conclusion, Dr. Kelley gives the defendant credit because he could not recall masturbating while watching the recorded images. The defendant reported, however, that he probably did, something Dr. Kelley does not even address.

The defendant claims that he first brought cameras on DECA trips to see if the students were drinking or using drugs in their rooms.[5] (Exhibit 13, pg. 5). He claims he then moved the cameras to the bathrooms because students spent so much time in there. (Id.). While it's hard to prove a negative, there is not a single picture taken by a single student that law enforcement spoke to that shows a recording device anywhere other than the bathrooms of the female students. While an air freshener was found in the boys' bathroom in Minneapolis, there was no camera. It was simply a decoy.

Moreover, if the defendant really wanted to see if the students were drinking, even in the bathroom, one camera would have been enough to capture that. Multiple cameras strategically placed in each bathroom, some over the toilet, some pointed at the shower, shows the defendant was trying to get sexually explicit images of the victims, not see if they were drinking.

The defendant also claims that he was primarily targeting "seniors who were 17 and 18 years old," that the youngest victim caught on camara was 15, and that he only caught the younger students on camera because they were sharing a room with the older students. (Exhibit 13, p. 6). He specifically denied capturing any 14-year-old students. (Id.). The problem with this claim is that it was the defendant who made the room assignments. It was the defendant who decided who was going to stay in the upgraded suite in the Wisconsin Dells that he paid for with his own money. It was the

---

[5] Considering that when interviewed, one student reported the defendant seemed to know that two girls were drinking when he was present and had no issue with it, this seems unlikely.

13

defendant who assigned one 14-year-old, one 15-year-old, four 16-year-olds, and only one 17-year-old to the Congo Suite in 2018. It was the defendant who assigned two 14-year-olds, one 16-year-old and three 17-year-olds to the Congo Suite in 2019.

The defendant is in certain respects, every parent's worst nightmare: a predator hiding in plain sight. The defendant's perceived "normalcy" is what makes him so dangerous. He was a teacher, who in addition to each student's parents, was responsible for molding these children and preparing them for the future. Parents trusted him to take their children to DECA conferences all over the country. The defendant violated this trust by putting recording devices in the female students' bathrooms. While the defendant did not physically assault the victims in this case, his conduct has nevertheless devastated numerous families. The toll this crime took on his victims' lives was profound.

The government recognizes that this case has some mitigating facts as well.[6] There is no evidence that the defendant shared the images or engaged in hands-on conduct.

But while there is no evidence the defendant sexually assaulted any child, many students and parents reported grooming behavior. The defendant participated in "DECA after dark" and engaged in "discussions that underage students shouldn't be

---

[6] The fact that the defendant has no prior record is not one of them. The defendant's record was taken into consideration in the calculation of his criminal history category, and it is not uncommon for people who assault children to have no criminal history. *See, e.g., United States v. Oberg*, 877 F.3d 261 (7th Cir. 2017). Moreover, it was the defendant's lack of a criminal history that allowed him to be a teacher and place him in the position to commit these crimes.

talking with teachers about in a hotel room in the early morning hours." At times, he was the one who asked about getting together. (Exhibit 14). He would talk with his students about how unhappy he was in his marriage and would ask the students not to discuss what they talked about with others. He told students which teachers at the school were having affairs. He showed up at a former student's birthday party uninvited and had to be asked to leave. He returned and was forced to leave by students who were uncomfortable with him being there.

      Here, in considering a just punishment that adequately reflects the seriousness of the crime, it is imperative for the Court to weigh the impact on the victims and their families. Not only are the defendant's victims left in his wake, but the children's parents must now struggle with their own feelings of guilt. As one parent said, the defendant not only fooled the kids, but also the adults. (R. 70). That is a burden that no parent should ever have to bear. Because of the defendant's actions, none of their lives will ever be the same. Additionally, the sheer volume of victims and the length of time that his actions occurred cannot be ignored. His actions warrant a substantial punishment.

      B.      Respect for the Law, Just Punishment, Adequate Deterrence, and Protection of the Public

      Based on the egregious nature of the defendant's criminal misconduct, there is a compelling need to deter future similar conduct by him and other like-minded individuals with an interest in, and access to, children. As described above, the fact that the defendant appeared to be a functioning member of society contributed to his dangerousness; no one knew that he was exploiting his students even though he was

15

doing it right under their noses. There is no reason to believe that anything but a lengthy term in prison will deter him from committing similar offenses in the future.

The sexual exploitation of children through the surreptitious production of images and videos is an offense that cannot be tolerated in our society. The sentence should deter the defendant from engaging in further criminal behavior, deter others from attempting to commit such awful crimes against children, and protect the public by ensuring that the defendant does not have another opportunity to victimize other children. The goal of deterrence is realized if even one person is deterred. A lengthy sentence will accomplish this goal.

This defendant, through the crimes documented in this case, has shown himself to be a manipulative, deceitful, serial offender with no demonstrated ability or attempts to cease, control, or even understand his behavior. To accomplish the goals of sentencing – particularly deterrence and protection of the public – the defendant must be sentenced to a truly significant term of imprisonment. He repeatedly victimized those whom he should have been protecting with no sign that he planned to stop before he was caught.

The government recognizes that this is not the type of case that this Court sees frequently, and as such, it may be difficult to quantify in years "how much" is "enough" to adequately punish the defendant, deter similar criminal conduct, and protect the public. While the government is asking for a lengthy sentence, it is entirely reasonable given the fact that the defendant systematically abused a position of trust to sexually exploit numerous young females. A fifteen-year sentence is not only

reasonable, but necessary in this case to promote respect for the law, to adequately punish the defendant for his criminal conduct, to deter him and others from offending in the same ways again, and for long-term protection of the public. It also recognizes the mitigating factors present in this case, and the fact that the defendant pleaded guilty and avoided the need for the victims to testify at a trial.

      C.      Similarly situated defendants

Finally, the Court should consider the sentences of similarly situated defendants. That is admittedly difficult in this case due to its uniqueness, but the most similar defendant appears to be Travis Greil who was recently sentenced by Judge Conley to eight years in prison. This defendant's conduct is more egregious, and his characteristics make him more dangerous.

Both cases involved teachers covertly recording their students over long periods of time. However, they differ in significant ways. First, Greil recorded his victims in the classroom, where they were dressed, not in hotel bathrooms where the students were naked. Second, Greil's crimes were more crimes of opportunity. Here, the defendant specifically arranged for the students and his babysitter whom he wanted to record to stay in particular hotel rooms where he set up recording equipment. Third, when confronted about his crimes, Greil ultimately came clean and admitted them. This defendant destroyed evidence. He lied to the police, claiming he turned the missing recording equipment over to security in the hotel. He exacerbated the victims' trauma by not calling the police when he said he did, and he lied to the students about the source of the devices, saying that people sometimes use the devices to record

17

housekeeping. Additionally, he continues to minimize his behavior, make excuses, and lie about his conduct. Hence, he deserves a longer sentence.

## CONCLUSION

For all the foregoing reasons, the government respectfully recommends that this Court sentence the defendant to fifteen years in prison to be followed by twenty years of supervised release. Such a sentence would be sufficient, but not greater than necessary, to reflect the seriousness of the offense and the goals of sentencing.

Dated this 19th day of October 2021.

                 Respectfully submitted,

                 TIMOTHY M. O'SHEA
                 Acting United States Attorney

By:    /s/
     ELIZABETH ALTMAN
     Assistant United States Attorney

By:    /s/
     LAURA PRZYBYLINSKI FINN
     Assistant United States Attorney